**CASE NO: 13-15858-C**
L.T. CASE NO.: 13-21413-CIV-Cohn/Seltzer

UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

---

TERESITA SORRELS

Plaintiff/Appellant

vs.

NCL (BAHAMAS) LTD., a Bermuda company
d/b/a NORWEGIAN CRUISE LINE

Defendant/Appellee

---

APPEAL TAKEN FROM
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

---

APPELLANT'S INITIAL BRIEF

---

ROBERT D. PELTZ (FL.BARNO.: 220418)
E-mail: Peltz@leesfield.com
CAROL L. FINKLEHOFFE (FL.BAR NO.: 15903)
E-mail: Finklehoffe@leesfield.com
**LEESFIELD & PARTNERS, P.A.**
Attorneys for Plaintiff
2350 South Dixie Highway
Miami, Florida 33133
Telephone:  305-854-4900
Facsimile:  305-854-8266
*Attorneys for Appellant*

## CERTIFICATE OF INTERESTED PERSONS
## and CORPORATE DISCLOSURE STATEMENT

Undersigned counsel for Appellants, TERESITA SORRELS and JOSEPH SORRELS, certifies that the following is a list of persons and entities who have an interest in the outcome of this case.

## TRIAL JUDGES

United States District Judge  James I. Cohn

United States Magistrate Judge Barry S. Seltzer

## ATTORNEYS

Carol L. Finklehoffe, Esq.,  *Attorney for Plaintiff/Appellant*

Hamilton, Miller & Birthisel, P.A., *Attorney for Appellee*

Jerry Hamilton, Esq. *Attorney for Appellee*

Hector Ramirez, Esq., *Attorney for Appellee*

Leesfield & Partners, P.A., *Attorneys for Plaintiff/Appellant*

Robert D. Peltz, Esq., *Attorney for Plaintiff/Appellant*

## PARTIES

NCL (Bahamas) Ltd., a Bermuda company
d/b/a NORWEGIAN CRUISE LINE, Defendant/Appellee

Joseph Sorrels, *Plaintiff/Appellant*

Teresita Sorrels, *Plaintiff/ Appellant*

Robert D. Peltz, Esq.
FBN: 220418

C 1 of 2

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant believes that oral argument would be helpful in this appeal, since it involves issues that continually reoccur in the district courts, despite the clarity of this Court's recent decision in *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190 (11th Cir. 2011), defining the proper scope of *Daubert* challenges. Due to the requirement contained in the tickets of virtually all cruise lines which are based in South Florida, lawsuits by passengers are required to be filed in the District Court for the Southern District of Florida. Regardless of the merits or the validity of the reason, these cruise lines routinely file *Daubert* motions as a matter of course in these cases. As a result, both the litigants and the courts spend an inordinate amount of time in dealing with such motions. Accordingly, this case presents the opportunity to further reiterate the proper basis and scope of *Daubert* challenges following this Court's earlier pronouncement in *Rosenfeld*.

## CERTIFICATE OF TYPE SIZE AND FONT

Undersigned counsel certifies that the size and style of type used in this brief is 14-point Times New Roman.

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS
and CORPORATE DISCLOSURE STATEMENT . . . . . . . . . C 1of 2

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . i

CERTIFICATE OF TYPE SIZE AND FONT . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.    WHETHER THE LOWER COURT MISAPPLIED THIS COURT'S
      OPINION IN *ROSENFELD v. OCEANIA CRUISES, INC.*, 654 F.3d
      1190 (11TH CIR. 2011) IN STRIKING THE TESTIMONY OF DR.
      RONALD ZOLLO AFTER RECOGNIZING THAT HE WAS
      QUALIFIED TO TESTIFY REGARDING THE SLIP RESISTANCE
      OF WALKING SURFACES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.   THE LOWER COURT MISAPPLIED THE PROPER STANDARDS
      FOR ANALYZING THE DEFENDANT'S MOTION FOR
      SUMMARY JUDGMENT AND ERRED IN GRANTING IT . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

*Anderson v. Malloy*, 700 F. 2d 1208 (8th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . 27

*Bailey v. Southern Pacific Transportation Co.*,
   613 F.2d 1385 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

*Beretta v. Home Lines, Inc.*, 1980 AMC 1857 (S.D. N.Y. 1990) . . . . . . . . . . . . . 32

*Bigelow v. New York Lighter Co., Inc.*,
   2005 WL 6742497 (W.D. Tex. June 27, 2005) . . . . . . . . . . . . . . . . . . . . . . 25

*Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981) . . . . . . . . . . . . . 28, 43

*Borden, Inc. v. Florida East Coast Ry Co.*,
   772 F.2d 750 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 42

*Britton v. Wal-Mart Stores East, L.P.*,
   2011 WL 3236189 (N.D. June 8, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

*Coastal States Marketing, Inc., v. United States*,
   646 F.Supp. 255 (U.S. Ct. Int'l Trade 1986) . . . . . . . . . . . . . . . . . . . . . 24, 25

*Cook v. Royal Caribbean Cruises Ltd.*,
   2012 WL 1792628 (S.D. May 15, 2012) . . . . . . . . . . . . . . . . . . . . . 24, 28, 33

*Darville v. Rahming Shipping Co., Ltd.*,
   1987 WL 48393 (S.D. Fla. Dec. 17, 1987) . . . . . . . . . . . . . . . . . . . . . . . . 29

*Doe v. Fishing Company of Alaska*,
   2007 WL 1296208 (W.D. Wash. May 1, 2007) rev'd on
   other grounds 300 Fed. Appx. 469 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . 25

*Dollar v. Long Mfg. N.C., Inc.*, 561 F.2d at 613 (5th Cir. 1977) . . . . . . . . . . . . 45

*Donlon v. Gluck Group, LLC.*, 2011 WL 6020574 (D.N.J. 2011) . . . . . . . . 24, 29

*Erikson v. Carnival Cruise Lines, Inc.*,
   649 So.2d 942 (Fla. 3d DCA 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Foster v. Flying J. Inc.*, 2008 WL 8929339
(D.Mont. March 21, 2008) .................................... 25

*Frazier v. Continental Oil Co.*, 568 F.2d 378 (5th Cir. 1978) ............... 29

*Galentine v. Holland American Line-West Tours, Inc.*,
333 F.Supp. 2d 991 (W.D. Wash. 2004) ........................... 33

*Grayson v. Carnival Cruise Lines, Inc.*,
576 So.2d 417 (Fla. 3d DCA 1991) ............................. 34

*Great Am. Ins. Co. v. Cutrer*,
298 F.2d 79 (5th Cir. 1962) ........................... 13, 28, 32

*Hairston v. The Gainsville Sun Publishing Co.*,
9 F.3d 913, 918 (11th Cir. 1984) ............................ 8, 30

*Harnesk v. Carnival Cruise Lines, Inc.*,
1992 A.M.C. 1472 (S.D. Fla. 1991) ........................... 32

*Jackson v. Firestone Tire & Rubber Co.*,
788 F.2d 1070 (5th Cir. 1986) ........................... 42, 44

*Jackson Tool & Die, Inc., v. Smith*,
339 F.2d 88 (5th Cir. 1964) .................................. 31

*Johnson v. U.S.*, 270 F.2d 488 (9th Cir. 1959) ........................ 27

*Jones v. Otis Elevator Co.*, 861 F.2d 655 (11th Cir. 1988) ................. 43

*Keller v. U.S.*, 38 F.3d 16 (1st Cir. 1994) ........................ 25, 28

*Lane v. Celtex Corp.*, 782 F.2d 1526 (11th Cir. 1986) .................... 30

*Lee's Aquarium & Pet Products, Inc. v. Python
Pet Products, Inc.*, 951 F.Supp. 1469 (S.D. Cal. 1997) .............. 25

*Leslie v. Carnival Corp.*, 22 So.3d 561 (Fla. 3d DCA 2008) .............. 7

*Mabrey v. Carnival Cruise Lines, Inc.*,
438 So.2d 937 (Fla. 3d DCA 1983)(Ferguson, J.) .................. 32

iv

*Maiz v. Virani*, 253 F.3d at 641 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*McGarrigle v. Mercury Marine*, 838 F.Supp. 2d 282 (D.N.J. 2011) . . . . . . . . . 24

*McGary v. Holland American Line Westours, Inc.*,
2004 A.M.C. 721 (W.D. Wash 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Melerine v. Avondale Shipyards, Inc.*,
659 F.2d 706 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Muncie Aviation Corp. v. Party Doll Fleet, Inc.*,
519 F.2d 1178 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Phelps v. Stein Mart, Inc.*, 2011 WL 1337362
(W.D. Lou. April 7, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK, Ltd.*,
326 F.3d 1333 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rabon v. Automatic Fasteners, Inc.*,
672 F.2d 1231 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Ramos v. Liberty Mut. Ins Co.*,
615 F.2d 334 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 39, 41, 44

*Reese v. Herbert*, 527 F.3d 1253 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 30

*Rosenfeld v. Oceania Cruises, Inc.*,
654 F.3d 1190 (11th Cir. 2011) . . . . . . . . . . . i, ii, 1, 8, 10, 11, 12, 14, 28, 45

*Santos v. Posadas De Puerto Rico Assocs., Inc.*,
452 F.3d 59 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Schmelzer v. Hilton Hotels Corp.*, 2007 WL 2826628
(S.D. N.Y. Sept. 24, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 44

*Stewart v. Booker T. Washington Ins.*,
232 F.3d 844 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Tampa Bay Water v. HDR Engineering Co., Inc.*,
731 F.3d 1171 (11th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Taylor v. Carnival Corp.,*
    2013 WL 4157520 (S.D. Fla. Aug. 14, 2013) ..................... 37

*Tidewater Marine LLC. v. Red Circle Transport Co.,*
    2004 WL 5492850 (E.D. Lou. March 5, 2004) .................... 24

*Tippens v. Celotex Corporation,*
    805 F.2d 949 (11th Cir. 1986) ................................. 30

*Weeks v. Remington Arms Co.,* Inc.,
    733 F. 2d 1485 (11th Cir. 1984) ........................... 33, 41

*Whalen v. Royal Caribbean Cruises Ltd.,*
    2013 WL 5595938 (S.D. Fla. Aug. 12, 2013) ..................... 26

*Worsham v. A.H. Robbins. Co.,*
    734 F.2d 676 (11th Cir. 1984) ............................. 33, 44

## **Other Authorities**

28 U.S.C. §1291 ................................................ 1

28 U.S.C. §1333 ................................................ 1

Federal Rules of Evidence 403 .......................................... 44

## STATEMENT OF JURISDICTION

The District Court properly exercised admiralty jurisdiction pursuant to 28 U.S.C. §1333.

This Court may properly exercise jurisdiction over the subject orders: (1) granting defendant's motion to exclude expert testimony and motion for summary judgment and (2) the entry of final judgment pursuant to 28 U.S.C. §1291.

## ISSUES PRESENTED

1.    Whether the lower court misapplied this Court's opinion in *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190 (11th Cir. 2011) in striking the testimony of Dr. Ronald Zollo after recognizing that he was qualified to testified regarding the slip resistance of walking surfaces.

2.    Whether the lower court misapplied the proper standards for analyzing the Defendant's motion for summary judgment and erred in granting it.

## STATEMENT OF CASE AND FACTS

The Plaintiff Teresita Sorrels was a passenger aboard the Defendant's vessel the Norwegian Sky, along with her daughter Katrynna and several classmates and parents, who were celebrating the end of the school year. It had been drizzling intermittently prior to the time that the Plaintiff boarded the Norwegian Sky and then thereafter during the day. [D.E. 66 at 5; 66-6 at 145-155].

At some point after boarding, the Plaintiff and her daughter joined her school friends and their parents for dinner at a buffet style restaurant that had two glass doors

1

adjoining the outside area of deck 11 toward the stern of the ship. The Plaintiff did not recall whether she had gone outside or stayed inside the doors.[1] [D.E.66-6 at 147-155].

Shortly after midnight on April 14, 2012, the first night of the cruise, the Plaintiff was listening to music at a shipboard lounge with some of the other parents, when she left to walk over to the teen center to pick up her daughter. See D.E. 66 at 7, 66-6 at 148-9. In route, the Plaintiff passed through a doorway and stepped out into an open air teak deck located on deck 11. [D.E. 66 at 7; 66-6 at 149-151]. Although it was not raining at the time, the deck was wet from the rain earlier in the evening. [D.E. 68 at 6].

As reflected by both the security video and deposition testimony, the Plaintiff

---

[1] In its opinion, the trial court states, "[a]fter boarding, Sorrels walked on an outdoor pool deck made of teakwood. See D.E. 61 at 2, ¶¶ 4-5, 7; D.E. 66 at 5-6 ¶¶4-5, 7. She knew the deck was wet from rain but had no trouble walking on it. *See Id.*" [D.E. 93 at 2.] As noted above, this is not an accurate statement of the "undisputed" facts, since the Plaintiff testified that she did not recall whether or not she had gone outside or stayed inside while they were at the buffet. See D.E. 66 -6 at 150-2.

Likewise, the second sentence was also taken out of context. Instead, the Plaintiff testified that she would have assumed the deck was wet "if it was raining" at the time. See D.E. 66-6 at 152-5. The Plaintiff testified that she did not recall whether it was raining or not at the time that she subsequently left the inside of the ship many hours later to walk across the teak deck immediately before the subject accident. See D.E.66-6 at 152-3. According to the Defendant's crew member, Solange Winifred, however, it was not raining at the time of the accident. [D.E. 68 at 6].

walked approximately 100 feet on the wet teak deck without any difficulty or problem. Suddenly in mid stride, as reflected by the security video, both of her feet literally went flying out from underneath her and she landed very hard in a sitting position, severely fracturing her wrist as she tried to break her impact. See [D.E. 66-1 and 66-6 at 162-4 and 167]. One of the Defendant's crew members, Solange Winifred, came over to assist the Plaintiff as she sat shocked on the deck. Ms. Winifred testified that she herself 'walked normally' on the wet deck and did not feel the need to take any special precautions, since the ship sailed whether it is sunny or raining. [D.E. 66 at 2; 66-6 at 109].

Winifred and ship's security guard Milan Rai testified that at times the deck department would post special portable signs on the outside teak deck warning passengers that it would be slippery when wet, after or during rain. [D.E. 66 at 2, 9, 16-17; 66-2 at 5-6; 78-1 at 5-6]. Ms. Winifred, who worked as a restaurant steward, also testified that she had been instructed as part of her job that whenever she saw any liquid on the teak floor of the Outdoor Café, which was part of the same teak deck on deck 11 in the stern of the ship, that she should immediately put up a sign and clean it, because it was known to her supervisors that the teak floor would be slippery when it was wet. [See Schematic at D.E. 66-5, page 9-11]. Ms. Winifred further testified that this was one of the topics covered in her department's monthly safety meetings. See [D.E. 66 at 9, 16-17; 66-6 at 102-7].

No warning signs were posted at the time of the Plaintiff's accident advising

3

passengers that the teak surfaces on deck 11 would be slippery when wet. See [D.E. 66-6 at 102, 108-9, 111, 118-9].

In subsequent testing of the coefficient of friction and slip resistance of the subject deck, both Dr. Ronald Zollo, Plaintiff's expert and David Wills, Defendant's expert had very similar findings. Each expert used the exact same measuring equipment, the English XL Tribometer and tested multiple planks, because neither could identify the exact plank that the Plaintiff fell on due to the low resolution of the security video. Each expert tested the selected planks in four different directions. [D.E. 66 at n. 4; D.E. 66-6 at 6, 9, 143-4].

Both experts found significantly different readings on different planks and also often on the same plank, depending upon which direction was being tested. [D.E. 57-2; 57-3; 66 at 2-3; 66-2 at 5-8; 68 at 10-11].    Dr. Zollo found slip resistance/coefficient of friction readings ranging from a low of 0.17 to a high of 0.70 during his testing of the wet deck under virtually identical conditions to the Plaintiff's accident, which also took place following a rain shower. [D.E. 57-2; 66 at 2-3; 66-2 at 5-8 and 66-6 at 6-8]. Likewise, Mr. Wills also found a similar wide spread variation in his test results, which were taken on the same day as Dr. Zollo's testing, ranging from a low of 0.35 to a high of .8. [D.E. 57-3; 66 at 2-3; D.E. 66-6 at 134].[2]

---

[2] Dr. Zollo's test results for the four planks in the area where the Plaintiff fell were:

1.    0.61 (north), 0.70 (south), 0.54 (east) and 0.55 (west)
2.    0.62 (north), 1.46 (south), 0.50 (east) and 0.54 (west)

Dr. Zollo testified that while a reasonable standard for slip resistance "in general" is 0.5, that the more appropriate standard for a ship sailing on the high seas,

3.    0.51 (east), 0.6 (east), 0.46 (west), 0.43 (northeast), 0.48 (east), 0.64 (north)
4.    0.25 (north), 0.28 (north), 0.34 (south), 0.32 (east), 0.14 (west) and 0.29 (west)

[D.E. 57-2 at 1].

Mr. Wills' test results on the same date had a similar wide spread divergence:

1.    0.35 (bow), 0.5 (starboard), 0.4 (stern) and 0.35 (port)
2.    0.45 (bow), 0.55 (starboard), 0.45 (stern) and 0.45 (port)
3.    0.7 (bow), .07 (starboard), 0.6 (stern) and 0.8 (port)
4.    0.55 (bow), 0.5 (starboard), 0.45 (stern) and 0.55 (port)
5.    0.35 (bow), 0.65 (starboard), 0.5 (stern) and 0.55 (port)
6.    0.4 (bow), 0.65 (starboard), 0.65 (stern) and 0.6 (port)

[D.E. 57-3 at 3].

Mr. Wills also performed an earlier test on his own with defense counsel on June 14, 2013, which provided even more disparate results:

1.    0.55 (bow), 0.75 (starboard), 0.55 (stern) and 0.85 (port)
2.    0.4 (bow), 0.5 (starboard), 0.3 (stern) and 0.35 (port)
3.    0.5 (bow), 0.75 (starboard), 0.4 (stern) and 0.8 (port)
4.    0.45 (bow, 0.55 (starboard), 0.4 (stern) and 0.45 (port)

[D.E. 57-3 at 1].

Dr. Zollo also performed additional testing at a different location in the proximity of two of the 31 other reported accidents in which he received the following readings:

1.    0.45 (north) 0.41 (south), 0.42 (east) and 0.41 (west)

[D.E. 57-2 at 2].

which provides a less stable platform for walking, is 0.6. [D.E. 66 at 3; D.E. 66-6 at 3-6, 93-4 and 99-100]. Accordingly, many of the planks tested by both Dr. Zollo and Mr. Wills failed to meet either of these standards, while others exceeded them. As a result, Dr. Zollo indicated that the slip resistance of the deck in the area where the Plaintiff fell was below the minimum standard values for a walkway to be considered sufficiently slip resistant and therefore constituted an unreasonably hazardous condition for passengers, such as the Plaintiff. [D.E. 66-2].

Dr. Zollo also stated that the tremendous variance between slip resistance which he (and Mr. Wills) found created a trap by lulling a passenger into a false sense of security as he or she traversed those areas where the skid resistance was appropriate. [D.E. 66-2]. He explained that this is why the Plaintiff did not have any difficulty during the initial portion of her journey, which is further reflected by the security video, filed as an Exhibit with the Plaintiff's Response to the Defendant's Motion for Summary Judgment. [D.E. 66-1]. Dr. Zollo further indicated that although the Defendant had notice of the unreasonable danger to its passengers caused by the lack of proper slip resistance, it failed to either eliminate this risk or to warn them of the danger that the deck was slipper in spots when wet. [D.E. 66-2].

## Disposition Below

On April 22, 2013, the Plaintiffs filed their complaint against the Defendant for damages. Count I was asserted by Teresita Sorrels for her injuries sustained in the above-captioned accident. Count II set forth a claim for loss of consortium by her

6

husband Joseph. [D.E. 1]. The Defendant filed a motion to dismiss directed to count II [D.E. 11], which was not ruled upon by the Court prior to the entry of summary judgment.

Contrary to the lower court's resuscitation of the facts, the Plaintiff's claim was not limited to the assertion "that Norwegian itself created a dangerous, slippery condition on the wooden pool deck by failing to properly maintain it." [D.E. 93 at 4]. The Plaintiff's suit was also based upon the ground that the teak deck was unreasonably hazardous to passengers when wet, since portions of it were insufficiently slip resistant to provide a safe walking surface and that although the Defendant was on notice of this problem, it failed to either remedy it or to warn passengers of it. [D.E. 66 at 1-4; D.E. 66-2].

On June 21, 2013, the Plaintiff filed a motion for binding jury trial [D.E. 16],[3] which was granted [D.E. 22] following the Defendant's stipulation for jury trial by

---

[3] As reflected in the motion, under the "savings to suitors" clause a cruise ship passenger has the right to bring a lawsuit in the state courts of Florida pursuant to which she would be entitled to a jury trial. Nevertheless, the Plaintiff's ticket of passage contains a provision requiring that all passenger lawsuits be filed in the Southern District of Florida. Florida's Third District Court of Appeal has upheld the enforceability of such clauses, requiring suit to be filed in federal court even when brought by Florida residents, in which case there is no diversity jurisdiction, only admiralty. See Leslie v. Carnival Corp., 22 So.3d 561 (Fla. 3d DCA 2008). Although the Plaintiffs believe that this provision is violative of federal case law and statute, see D.E. 16 at 2, n.1, since there is no right of direct appeal from the Florida state courts to this Court, the Plaintiffs had no alternative but to file this case in federal court.

consent [D.E. 21]. This case was set for jury trial on the court's two week calendar

commencing December 16, 2013. [D.E. 14].

## STANDARD OF REVIEW

The courts of appeal review orders granting summary judgments *de novo*,

applying the same legal standard applicable to the district court in the first instance.

*E.g. Hairston v. The Gainsville Sun Publishing Co.*, 9 F.3d 913, 918 (11th Cir. 1984).

Under Federal Rule of Civil Procedure 56(c), a summary judgment may only be

entered when all "pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."

*Id.*

The standard of review for a trial court's decision to exclude an expert's

testimony is based upon an abuse of discretion, which in the case of an evidentiary

ruling excluding such testimony requires a showing that the ruling is manifestly

erroneous. *See e.g. Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190 (11th Cir. 2011)

(reversing the trial court's exclusion of the Plaintiff's engineering expert on the

adequacy of the flooring of the defendant's vessel for use by passengers).

## SUMMARY OF THE ARGUMENT

The Plaintiff, Teresita Sorrels, was seriously injured when she slipped and fell

on a wet teak deck while a passenger aboard the Defendant's vessel, the *Norwegian

Sky*. In support of her claim, the Plaintiff presented the testimony of Dr. Ronald

8

Zollo, who holds a doctorate in civil engineering, has spent over 30 years as a professor of civil engineering at the University of Miami and also served for 10 years as the Associate Chairman for the University's Department of Civil and Architectural Engineering. Dr. Zollo has also written over 26 peer review civil engineering articles, lectured throughout the United States, North America and Europe and has served on various engineering committees tasked with the development of engineering and architectural safety standards.

Dr. Zollo concluded that the coefficient of friction values in the area where the Plaintiff fell were below the minimum standards that have long been accepted as required in order to classify a walkway surface as slip resistant, thereby rendering it unreasonably dangerous. He further expressed the opinion that the walkway produced a false sense of security for the individuals using it due to the wide range of friction resistance along it, often times within the same plank. Dr. Zollo also concluded that while the Defendant had notice of these unreasonable dangerous hazards, it failed to either remedy them or warn the Plaintiff that the deck was slippery when wet.

Dr. Zollo's opinions where based upon (1) an actual inspection and testing of the deck on the Norwegian Sky under virtually identical conditions as the Plaintiff's accident, following a rain shower, using the same testing equipment as Defendant's expert, (2) a review and analysis of the security video showing both the Plaintiff's fall and the events leading  up to it, (3) the deposition testimony of the Plaintiff, the

9

Defendant's corporate representative and two crew members and (4) various relevant industry standards in addition to his extensive education, background and training in civil engineering and architectural issues.

Although recognizing that Dr. Zollo was "qualified to testify competently regarding the slip resistance of walking surfaces, including the teak wood deck of the *Norwegian Sky*," the trial court nevertheless, proceeded to strike his testimony on the grounds that "it [was] not based on reliable methods." In so doing, the lower court not only misapplied the application of the *Daubert* test, but this Court's 'all fours' opinion in *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190 (11th Cir. 2011).

In addition to striking Dr. Zollo's testimony, the lower court then erroneously granted the Defendant's motion for summary judgment. The entry of summary judgment was not only erroneous by virtue of the court's improper exclusion of Dr. Zollo's testimony, but also by virtue of its ignoring the considerable additional evidence in the record, which was clearly sufficient by itself to independently create a question of fact as to the unreasonably dangerous nature of the area where the Plaintiff fell.

In this regard, there were no warning signs posted at the time of the accident advising passengers that the deck could be slippery when wet, despite the fact that two crew members testified that such signs would often be posted when it rained. One of these crew members, who worked as an assistant waiter, also testified that she had been instructed by supervisors as part of her job that whenever she saw water or

10

some other liquid on the floor of the Outdoor Café, which was located on the same teak deck, that she should immediately put up a sign and clean it, because it was known that the floor would get slippery when it was wet. In addition, discovery also established that there had been 22 prior substantially similar accidents involving passengers on the teak deck of the vessel in the three year period prior and the one year after the Plaintiff's accident.

Accordingly, not only did the trial court misapprehend this Court's controlling opinion by striking Dr. Zollo's testimony, but it further committed error by granting the Defendant's motion for summary judgment, since there was sufficient evidence in the record to create a question of fact as to the unreasonably dangerous nature of the subject area even without Dr. Zollo's testimony.

## ARGUMENT

**I.    WHETHER THE LOWER COURT MISAPPLIED THIS COURT'S OPINION IN *ROSENFELD V. OCEANIA CRUISES, INC.*, 654 F.3d 1190 (11TH CIR. 2011) IN STRIKING THE TESTIMONY OF DR. RONALD ZOLLO AFTER RECOGNIZING THAT HE WAS QUALIFIED TO TESTIFY REGARDING THE SLIP RESISTANCE OF WALKING SURFACES.**

Although the lower court concluded that Dr. Zollo was "qualified to testify competently regarding the slip resistance of walking surfaces, including the teak wood deck of the Norwegian Sky," it nevertheless proceeded to strike his testimony

11

on the grounds that, "it [was] not based on reliable methods."[4] [D.E. 93 at 8-9]. In

doing so, the lower court not only misapplied the application of the *Daubert* test, but

this Court's virtually 'all fours' opinion in *Rosenfeld v. Oceania Cruises, Inc.*, 654

F.3d 1190 (11th Cir. 2011).

Although the lower court paid lip service to *Rosenfeld*, it then proceeded to

completely ignore its holding. As a result, the lower court not only deprived the

Plaintiff of her right to a jury trial, but her ability to present evidence at trial and

cross-examine the Defendant's witnesses.

In *Rosenfeld*, this Court reversed the trial court's exclusion of a "floor safety

specialist" retained by the Plaintiff to perform "various coefficient-of-friction tests

to determine the slip resistance of the [vessel's] flooring surfaces." 654 F.3d at 1192.

Based upon his testing, the expert determined that the deck had "an inadequately low

coefficient of friction," and as a result "proposed to testify at trial that the flooring

surface was not reasonably safe for a self serve or bistro area, because it posed a high

---

[4] As subsequently discussed in more detail, the Court expressed the following
three bases for its conclusion that Dr. Zollo's opinion was not based upon reliable
methods:

"First. . . Zollo tested no points along Sorrels path [in the areas where she did
not fall] to determine whether the slip resistances there were adequate . . ." [D.E. 93a
at 10];

"Second . . . Zollo conducted his slip resistance test nearly a year and a half
after Sorrels accident . . ." [D.E. 93 at 10];

"Third. Plaintiffs have not shown that the COF standards relied upon by Zollo
apply to the Norwegian Sky's pool deck" [D.E. 93 at 11].

risk for those passing through the Café to slip and fall." *Id.*

In reversing the lower court's exclusion of the plaintiff's expert, this Court

explained:

> Further, 'it is not the role of the district court to make ultimate
> conclusions as to the persuasiveness of the proffered evidence.'
> *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK, Ltd.*, 326 F.3d 1333,
> 1341 (11th Cir. 2003); *Maiz*, 253 F.3d at 666 ("A district court's
> gatekeeping role under *Daubert* is not intended to surplant the
> adversary system or the role of the jury."(internal quotation marks
> omitted). "Quite the contrary, 'vigorous cross-examination,
> presentation of contrary evidence, and careful instruction on the
> burden of proof are the usual and appropriate means of attacking
> shaky but admissible evidence.'" *Quiet Tech,* 326 F.3d 1341
> (*quoting Daubert*) 509 U.S. at 596, 113 S.Ct. at 2798). Indeed, "in
> most cases, objections to the inadequacies of a study are more
> appropriately considered an objection going to the weight of the
> evidence rather than its admissibility" [citations omitted].

*Id.* at 1193.

Accordingly, this Court went on to hold that the expert should have been

permitted to testify regarding the unreasonably dangerous nature of the flooring based

upon his coefficient of friction testing:

> A qualified expert who uses reliable testing methodology may
> testify as to the safety of a defendant's choice of flooring,
> determined by the surfaces coefficient of friction. *See e.g. Great
> Am. Ins. Co. v. Cutrer*, 298 F.2d 79, 80- 81 (5th Cir. 1962)(noting
> that both the plaintiff and defendant presented expert evidence
> about the coefficient of friction on the steps and sidewalk where
> the Plaintiff fell); *See also Santos v. Posadas De Puerto Rico
> Assocs., Inc.*, 452 F.3d 59, 63-64 (1st Cir. 2006)(approving the
> admission of testimony regarding the variable friction between
> the pool steps and their edges on the grounds that it was crucial
> to the plaintiff's theory of the case).

13

*Id.* at 1193-4 (emphasis added).

This Court further noted that while the district court's opinion had only discussed whether the experts testimony would be helpful to the jury, that the defendant had advanced the same additional arguments on appeal as raised by NCL in the lower court in this case,

> concerning the reliability of the [expert's] methods. Specifically [the shipowner] argues that [the expert's] methods failed to accurately test for wet conditions and that his conclusions were "imprecise and unspecific" and based on "incorrect assumption[s]" about the location of *Rosenfeld's* fall. However, based on the facts of this case, these arguments attack the weight and persuasiveness of [the expert's] testimony, not its admissibility. [The shipowner] can raise these arguments on retrial through "'vigorous cross-examination'" and "'presentation of contrary evidence'" *Quiet Tech*, 326 F.3d at 1346 (*quoting Daubert* 509 U.S. at 596, 113 S.Ct. at 2798).

This Court reiterated these principles in its even more recent opinion in *Tampa Bay Water v. HDR Engineering Co., Inc.*, 731 F.3d 1171 (11th Cir. 2013). In an observation equally applicable here to Dr. Zollo's extremely impressive credentials,[5]

---

[5] Dr. Zollo received his Bachelor of Science, Masters and PhD degrees in Civil Engineering from the Carnegie Institute of Technology. In addition to teaching as a tenured professor in engineering at the University of Miami College of Engineering for over 30 years, Dr. Zollo also served as the Associate Chairman for the university's Department of Civil and Architectural Engineering for 10 years. [D.E. 66-2 at 11].

Dr. Zollo has published over 26 peer review civil engineering articles in a number of highly respected engineering journals, authored four civil engineering books and monographs and wrote over 27 other articles on a variety of civil engineering topics, which were identified in his Expert Witness Disclosure. [D.E. 66-2 at 11-19].

14

this Court noted that an expert's credentials are properly considered in determining

whether his methodology is reliable:

> Although an expert's qualifications go primarily to the first prong
> of *Daubert's* inquiry, "an expert's overwhelming qualifications
> may bear on the reliability of his proffered testimony" even if
> they are by no means a guarantor of reliability." *Id.* at 1341. In
> this case, [the expert] received both his bachelors degree, in
> Chemical Engineering, and his doctorate, in Civil Engineering,
> from MIT. . .

731 F.3d at 1185.

The lower court clearly misconstrued the nature and scope of Dr. Zollo's

opinions. Although Dr. Zollo expressed the opinion that the "Norwegian Sky's pool

deck 'trap[s] individuals via a false sense of security based on the wide range of

---

During the course of his career, Dr. Zollo has also been invited to give at least
47 lectures and presentations throughout the United States, North America and
Europe to such organizations as the Department of Energy, National Institute of
Building Sciences, National Science Foundation, General Building Association,
Florida Engineering Society, The American Institute of Architects and the Society of
the American Registered Architects. In addition, he has also received numerous
awards, honors and elected memberships, including by the American Society for Civil
Engineering (Fellow), the American Concrete Institute (Fellow), Dade County
Building Code Evaluation Task Force, Dade County Building Code Committee and
Engineer of the Year by the South Florida Engineering Society. [D.E. 66-2 at 11-19].

In addition to his extensive writing, he has also worked as a reviewer for the
National Science Foundation, the National Resource Counsel of the Untied States and
the National Science and Research Counsel of Canada. He has also served on various
committees of the American Society for Testing and Materials (ASTM) and the
American Society of Civil Engineering (ASCE), which are charged with the
responsibility for adopting various construction standards and guidelines. [D.E. 66-2
at 11-19].

15

friction resistance along the walkway,'" D.E. 93 at 9, this was hardly his sole opinion, much less his "central theory" as concluded by the lower court.

Instead, as reflected by both his expert witness disclosure and extensive deposition, Dr. Zollo's central opinion was that the co-efficient of friction values in the area where the Plaintiff fell were "below [the] minimum standard values that have long been accepted as required in order to classify a walkway surface as slip resistant," thereby rendering it unreasonably dangerous. This opinion was based upon (1) an actual inspection and testing of the deck on the Norwegian Sky under virtually identical conditions as the Plaintiff's accident following a rain shower, (2) a review and analysis of the security video showing both the Plaintiff's fall and the events leading up to it, (3) the deposition testimony of the Plaintiff Teresita Sorrels, the Defendant's corporate representative Jane Kilgour and crew members Solange Winifred and Milan Rai and (4) various relevant industry standards in addition to his extensive education, background and training in civil engineering and architectural issues. [D.E. 66-2]. In addition, Dr. Zollo also stated that while the Defendant had notice of the dangerous condition caused by the lack of skid resistance of its deck, that it failed to either eliminate the hazard or to warn passengers that the deck was slippery when wet. [D.E. 66-2].

The reasoning behind the lower court's exclusion of Dr. Zollo's opinions also confuses the *Daubert* requirement of the "reliability of an expert's methodology," with the lower court's perception of the weight and persuasiveness of his opinions.

16

The court's belief that Dr. Zollo failed to account for <u>all</u> of the possible variables that could have been considered goes to the weight of his testimony and not the reliability of his methodology.

Instead, Dr. Zollo's "testing methodology" consisted of his use of the English XL Tribometer, the validity and accuracy of which was not questioned by the Defendant. In fact, the Defendant's expert utilized the same identical type of equipment in performing his own testing. [D.E. 68 at 2-3].

It is also significant that both experts obtained similar results from their testing. As set forth in more detail in the appellant's statement of the facts, each expert, using the exact same measuring equipment, found significantly different readings on different planks, and also often on the same plank, depending upon which direction was being tested.

Dr. Zollo found slip resistance/coefficient of friction readings ranging from a low of 0.17 to a high of 0.70 during his testing of the wet deck under virtually identical conditions to the Plaintiff's accident following a rain shower. Likewise, David Wills, the Defendant's expert, found a similar wide spread variation in his testing, which was performed on the same day as Dr. Zollo, ranging from a low of 0.35 to a high of .8. [D.E. 57-2, 57-3; 66 at 2-3; D.E. 67 at 10-11]. Significantly, Mr. Wills recorded similar findings in a prior test, which he had performed with defense counsel on a bright and sunny day using a cup of water to wet the area. These earlier tests results ranged from a low of 0.3 to a high of 0.8. One plank alone had readings

17

ranging from 0.4 to 0.8, depending upon the direction of testing. [D.E. 57-4; 68 at 11].

Not only did the court's order overlook the basic underlying nature of Dr. Zollo's testimony - that the area of where the Plaintiff fell was unreasonably slippery and therefore unreasonably dangerous – but its further conclusion that Dr. Zollo did not have a sufficient basis to support his ancillary opinions also ignored the evidence in the record upon which Dr. Zollo relied. This failure is clearly apparent from the lower court's exclusion of Dr. Zollo's opinion that the variance in the slip resistance, which both he and Mr. Wills found, would give rise to a false sense of security, because he "tested no points along Sorrels path to determine whether the slip resistance there were adequate or whether the COF readings at those points varied significantly from each other or from the areas where Sorrels fell." [D.E. 93 at 10].

Contrary to the court's conclusion, it was not necessary for Dr. Zollo to test the teak flooring over the 100 feet or so that Teresita Sorrels walked prior to slipping and falling in order to determine that it was sufficiently slip resistant. The central issue in this case was whether the area where the Plaintiff fell was slippery, not whether the areas where the Plaintiff didn't fall were not slippery. Nevertheless, to the extent that this issue is significant (ie: with regard to the question of comparative negligence), there was clearly sufficient evidence for Dr. Zollo to rely upon in reaching this conclusion.

In this regard, Dr. Zollo had the opportunity to review the security video, which showed the Plaintiff walking along this path in a normal fashion without any problem until she reached the point where she fell, when both of her feet literally flew out from underneath her. The depictions of the video were further confirmed by the testimony of Ms. Sorrels herself that she had no difficulty walking normally on the deck from the time that she went through the exterior doors up until the point where she slipped and fell. Clearly, the video and the deposition testimony constitute sufficient, proper and reliable evidence for a civil engineer, such as Dr. Zollo, to conclude that the coefficient of friction of the area where the Plaintiff walked prior to falling was sufficient and adequate.

Dr. Zollo's conclusion that the adequacy of the footing prior to the point where the Plaintiff fell was sufficient to provide a false sense of security was also echoed by the Defendant's second liability expert, Bryan Emond, who testified:

Q: And if someone was walking across the portion of the deck that was not dangerously slippery, would that give the person the belief that the remainder of the deck was not slippery?

A: I think that they would expect it would be of similar consistency.

Q: So if a person walked 100 or 135 feet on a deck and did not have difficulty walking on the wet deck would that provide them with a reasonable expectation that the remainder of the deck would have a similar consistency?

A: Yes. As long as there was no other information provided to them, yes.

[D.E. 75 at 7; 75-1 at 10-11].

19

Q:     In order for a passenger to be able to address the risk of slipping
       on a wet teak deck, the passenger would have to appreciate that
       the teak deck posed a hazardous slipperiness to them, right?

A:     Yes.

       . . .

Q:     So you are saying if she walked for 100 feet and didn't feel that
       there was a risk of slipping on the deck, that there was no risk of
       her slipping on the deck?

A:     No. I am saying she had an opportunity to assess it. That is all I
       said.

Q:     But if the slipperiness of the deck differed in the first 100 or 130
       feet that she walked on, compared to the area where she fell, she
       would not have an ample opportunity to assess the risk of
       slipping, would she?

A:     If that were the case, yes.

[D.E. 66 at 4, n.6; 66-6 at 180-1].

The court's further conclusion that Dr. Zollo's testing should be excluded since

"Plaintiffs have not shown that the same conditions existed on the deck at the time

Sorrels fell," D.E. 93 at 10, not only ignores the actual evidence in the record, but

constitutes an impermissible usurpation of the jury's function by deciding questions

of fact, which at most would go to the weight of his testimony.

In this case, there was clearly overwhelming evidence of the substantial

similarity of the conditions which existed at the time of Dr. Zollo's testing in relation

to the conditions existing at the time of the accident. Here, a video record not only

existed, but was before the court, depicting the conditions at the time of the Plaintiff's

accident. This video demonstrated that the teak deck was wet from the rain, which

20

had stopped shortly before the accident. Not only did Dr. Zollo specifically testify that the conditions of the deck at the time of his inspection were substantially similar, but so did the Defendant's experts David Wills and Bryan Emond. [D.E. 68 at 6; 88-3 at 2]. In addition, the parties and experts also took numerous photographs during the inspection, which were in the record and also clearly established the substantial similarity of the conditions. See D.E. 66-4; 66-5 and 88-1.

While the court noted that Dr. Zollo's inspection occurred "nearly a year and a half after Sorrels accident," the mere passage of time is not enough to invalidate slip resistance tests. If it was, it would be virtually impossible for any plaintiff in any slip and fall case, whether on land or sea, to ever be able to present evidence on this issue. Where an accident occurs on a cruise ship or other premises under the defendant's control, the plaintiff does not have the ability to simply go out and test the area the day after the accident. Instead, it obviously must either obtain the defendant's approval or as was done in this case, obtain an order of the court directing the defendant to permit such inspection and testing.

In this case, there was clear evidence in the record establishing that the teak deck had not been changed in any significant manner between the date of the Plaintiff's accident and Dr. Zollo's inspection. According to Jane Kilgour, the Defendant's corporate representative, the teak deck had been originally installed at the time that the ship was built in 1999 or 2000 and had never been replaced or changed. [D.E. 66-6 at 89-93 and 127].

21

As further discussed in more detail in the subsequent section regarding the admissibility of the Defendant's interrogatory answers regarding the 22 prior substantially similar accidents, these other slip and fall accidents on the teak deck occurred consistently from at least the year 2009, which was the first year subject to the court's discovery order, up to 2013, the last year covered by the order. [D.E. 33]. The continued existence of these other incidents also clearly supports the conclusion that the teak deck had not changed in the year and a half between the date of the Plaintiff's accident and Dr. Zollo's inspection.

The lower court's final rationale in support of its order striking Dr. Zollo's testimony, to wit: that "Plaintiffs have not shown that the COF standards relied on by Zollo applied to the Norwegian Sky's pool deck," D.E. 93 at 11, is not only legally incorrect, but also not dispositive of the issue.

On both his Expert Witness Disclosure and deposition, Dr. Zollo indicated that the minimum reasonable standard for slip resistance "in general" is 0.5, however, that a more appropriate standard for a ships sailing on the high seas, which provide a less stable platform for walking is 0.6. [D.E. 66-2; 66-6 at 3, 4, 11, 12, 99, 100]. In addition to general civil engineering standards and practices based upon his experience in the field for over three decades, Dr. Zollo referred to a number of different codes and standards, including ASTM standard F1166-07, entitled Standard Practice for Human Engineering Design for Marine Systems Equipment and Facilities, which provides in pertinent part:

22

> 11.12.1.2 Walkways, passageways, decks and all other walking surfaces shall have a skid surface sufficient to provide a coefficient of friction (COF) of 0.6 or higher measured when the surface is wet.

[D.E. 68-3 at 4-10]. Dr. Zollo also referred to other specific standards, including both OSHA and Carnival Cruise Lines Company Safety Standards as being applicable to provide evidence of the appropriate standards of skid resistance for public walkways aboard vessels. [D.E. 66-6 at 92-3; 66-1; 68 at 17; 68-3].

The trial court rejected reference to the ASTM standard, concluding that it "discuss[ed] general safety standards for **workers** aboard ships [and] did not address the appropriate standards for passenger areas on cruise ships." [D.E. 93 at 11] (emphasis in the original). The court further concluded that the Carnival standard does not "establish an advisory guideline or industry custom applicable to Norwegian." [D.E. 93 at 12, n.7.]

It is important to note that the trial court did <u>not</u> reject the applicability of ASTMF1166-07 on the grounds that it was unreliable or lacking in engineering integrity.[6] Instead, the court concluded that it was only applicable to "workers aboard ships" and not passengers. [D.E. 93 at 12].

Many courts considering admiralty cases have recognized the authoritative

---

[6] Neither did the Defendant's expert David Wills. Instead, he contended that it was not applicable because it had been promulgated by ASTM after the Norwegian Sky had been built and that it had not been adopted by any "enforcement authority over that ship." [D.E. 79-5 at 2-3].

nature of ASTM standards[7] as evidence of industry standards applicable to ship construction. *See e.g. Cook v. Royal Caribbean Cruises Ltd.*, 2012 WL 1792628 (S.D. Fla. May 15, 2011)(holding ASTM F1637-95 Standard Practice for Safe Walking Surfaces relevant evidence to establish lack of compliance with the applicable standard of care in a cruise line trip and fall case); *Donlon v. Gluck Group, LLC.*, 2011 WL 6020574 (D.N.J. 2011)(holding expert's testimony that vessel was not in compliance with ASTM standards relating to handrails and treads was by itself sufficient to require denial of ship owner's motion for summary judgment in a fall case); *McGarrigle v. Mercury Marine*, 838 F.Supp. 2d 282 D.N.J. 2011 (denying recreational boat manufacturer's motion for summary judgment in suit brought by boat owner for personal injuries based upon testimony of Plaintiff's expert that the boat violated the provisions of ASTM F1166-07 "by analogy," even if the standard was only applicable to commercial vessels); *Tidewater Marine LLC. v. Red Circle*

---

[7] The American Society for Testing Materials, now known as ASTM Int'l (ASTM) is a scientific and technical organization, whose purpose is the development of standards of characteristics and performances for products, systems and services. *See Coastal States Marketing, Inc., v. United States*, 646 F.Supp. 255 (U.S. Ct. Int'l Trade 1986). The ASTM has over 40,000 members consisting of engineers, scientists, professors, technical experts, business professionals and representatives of numerous industries from over 150 countries. The ASTM has developed thousands of product quality and safety standards in various industries through 143 technical standards-writing committees, including ASTM Committee F25 on Ships and Marine Technologies. These standards are developed pursuant to the strict guidelines and oversight established by the ASTM Technical Committee. See ASTM Int'l http://www.astm.org/about/facts-html; http://www.astm.org/about/factsheet-html; http://www.astm.org/about/full_overview/html.

24

*Transport Co.*, 2004 WL 5492850 (E.D. Lou. March 5, 2004)(denying defendant's

motion in limine to bar references to ASTM standards); *Doe v. Fishing Company of*

*Alaska*, 2007 WL 1296208 (W.D. Wash. May 1, 2007) *rev'd on other grounds* 300

Fed. Appx. 469 (9th Cir. 2008)(unpublished).

      ASTM standards have also been routinely upheld by the federal courts as

evidence of whether the proper standard of care has been met in landbased cases as

well. *See e.g. Phelps v. Stein Mart, Inc.*, 2011 WL 1337362 (W.D. Lou. April 7,

2011)(expert's testing of floor tiles which resulted in COF finding of 0.48 was

admissible evidence of negligence based upon violation of landbased ASTM .5

standard); *Bigelow v. New York Lighter Co., Inc.*, 2005 WL 6742497 (W.D. Tex. June

27, 2005); *Lee's Aquarium & Pet Products, Inc. v. Python Pet Products, Inc.*, 951

F.Supp. 1469 (S.D. Cal. 1997); *Britton v. Wal-Mart Stores East, L.P.*, 2011 WL

3236189 (N.D. June 8, 2011); *Foster v. Flying J. Inc.*, 2008 WL 8929339 (D.Mont.

March 21, 2008)(expert's testimony that floor mats violated ASTM standards

admissible on the issues of whether premises owner was negligent in fall case);

*Coastal States Marketing, Inc. v. United States*, 646 F.Supp. 255 (Ct. Int'l Trade

1986)(and cases cited therein); *Keller v. United States*, 38 F.3d 1st Cir. 1994 (holding

that the threshold for ASTM standards to constitute evidence of negligence it only

relevance).

      The lower court's reading of the ASTM standard to be limited in its application

to crew members is clearly over restrictive and illogical. As reflected by the facts in

the record of this case, the subject walkway area[8] was utilized by both passengers and crew. In fact, crew member Winifred testified that she was walking through this area on her way from her work station back to her cabin when she saw Ms. Sorrels, just as she was falling to the deck. [D.E. 66 at 16]. To suggest that this standard would apply to Ms. Winifred, but not Ms. Sorrels while they were both walking in the same area is without legal rhyme or reason.

In support of its conclusion that Carnival Safety Standards did not establish either an advisory guideline or industry custom, the court cited to *Whalen v. Royal Caribbean Cruises Ltd.,* 2013 WL 5595938 (S.D. Fla. Aug. 12, 2013) in which the trial judge had rejected reliance upon the land based Guidelines for Stair Safety promulgated by the Consumer Products Safety Commission. The substantial difference in reliance upon the passenger safety guidelines for cruise ships utilized by the world's largest cruise line to establish industry standards in a cruise line case as opposed to relying upon a land based standard adopted by the Consumer Product Agency is obvious to say the least. Carnival operates 24 cruise ships under its own brand, in addition to 17 Princess, 15 Holland American, 3 Cunard, 6 Seabourn and 15 Costa ships. Cruise Line International Association, Inc., Cruise Lines & Ships, http://www.cruising.org/vacations/cruise-lines-ships (last visited on January 22,

---

[8] The area where the Plaintiff fell was adjacent to the pool, however, it was also a main walkway area for passengers and crew going from the aft portions of the ship to the bow. At the time of the Plaintiff's accident (shortly after midnight) the pool was closed.

26

2014). Clearly, these Carnival guidelines rise to the level of industry standards. *See e.g. Anderson v. Malloy*, 700 F. 2d 1208 (8th Cir. 1983)(security practices of a competing hotels in the area were relevant evidence of the security practices required by the standard of reasonable care to be utilized at the subject hotel); *Johnson v. U.S.*, 270 F.2d 488 (9th Cir. 1959)(evidence of safety practices at competing power companies admissible as evidence of negligence).

Carnival's standard, which went into effect prior to the date of the subject accident,[9] sets forth the "minimum requirements for materials used for walking surfaces in common guest areas on Carnival Cruise Lines New Builds." It goes on to provide in pertinent part:

> The following are the minimum requirements for materials used for walking surfaces in guest areas on CCL vessels:
>
> A.    In areas of the vessel where there is significant potential for liquid accumulation condensation or changes in elevation such as ramps or stairs, the flooring shall at least have an "R" category of 10 and a minimum Static Coefficient of Friction (wet) (SCOFw) of 0.6. The use of polished stone areas should be minimized.

Perhaps even more importantly, however, it is obvious with regard to both the ASTM and Carnival standards that the trial court confused the concepts of negligence per se with evidence of negligence. The overwhelming weight of authority allows non-binding codes and standards to be admitted for the purposes of showing evidence

---

[9] The original of the standard was effective June 27, 2008, with a revision date of March 18, 2011.

27

of negligence or the applicable standard of care, even where compliance with them is not mandatory for the defendant. *See e.g. Great American Ins. Co. v. Cutrer*, 298 F.2d 79 (5th Cir. 1962),[10] expressly relied upon by this Court in *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190 (11th Cir. 2011), which upheld the admissibility of various National Building Codes adopted after the construction of the subject premises on the grounds that they established evidence of the proper standard of care, even though compliance was not mandatory by the building owner. *Also see Melerine v. Avondale Shipyards, Inc.*, 659 F.2d 706, n. 22 (5th Cir. 1981)(although OSHA regulations were not binding on third party who was not the plaintiff's employer, they were evidence of negligence); *Rabon v. Automatic Fasteners, Inc.*, 672 F.2d 1231 (5th Cir. 1982)(same); *Keller v. U.S.*, 38 F.3d 16 (1st Cir. 1994)(to be considered evidence of the negligence the ASTM standard need only be relevant).

In fact, if the codes or standards were mandatory, their violation would cause the premises owner to be guilty of negligence per se. *See Melerine*, 659 F.2d at n. 22. As pointed out by the court in *Cook v. Royal Caribbean Cruises Ltd.*, 2012 WL 1792628 (S.D. May 15, 2012) in rejecting the very same arguments made by the Defendant herein:

> Defendant seeks to exclude the standards/guidelines at issue because they are not mandatory, do not have the force of law and are not always directly applicable to maritime conditions. But the

---

[10] This opinion constitutes binding precedent in this circuit under *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc).

28

law in the Eleventh Circuit, as established by the former Fifth Circuit, is that advisory guidelines and recommendations, while not conclusive, are admissible as bearing on the standard of care in determining negligence. *Muncie Aviation Corp. v. Party Doll Fleet, Inc.*, 519 F.2d 1178 (5th Cir. 1975)(affirming admission of advisory materials published by the Federal Aviation Administration); *Frazier v. Continental Oil Co.*, 568 F.2d 378 (5th Cir. 1978)(reversing trial judge's order granting a directed verdict to defendant because district court improperly failed to consider expert witness testimony based on industry standards in the National Fire and Protection Association Code).

District court judges in the Eleventh Circuit have followed the rule that "failure to follow recognized rules that are not mandatory is admissible to show how a reasonable person might have acted." *Darville v. Rahming Shipping Co., Ltd.*, Case No.: 85-1282-civ-MARCUS, 1987 WL 48393, at *10 (S.D. Fla. Dec. 17, 1987)(rejecting argument that regulations for vessels of one size were irrelevant to one of a smaller size because "it is arguable that [Defendants] failure to fulfill [non-binding] Coast Guard or other maritime requirements still constitute some evidence of negligence."

Not surprisingly, other federal districts and circuits have followed this evidentiary rule as well as have state appellate courts. [numerous citations omitted].

2012 WL 1792628 at *3. *Also see Donlon*, 2011 WL 6020574 at n. 4 and 5.

In conclusion, it is clear that the district court erred in striking Dr. Zollo's testimony and that the grounds asserted by the court in support of its conclusion that Dr. Zollo had not utilized "reliable methods," constituted at most were matters to be argued by counsel for the Defendant in cross-examination and not a valid basis for the court's exclusion of the testimony altogether.

29

## II.    THE LOWER COURT MISAPPLIED THE PROPER STANDARDS FOR ANALYZING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND ERRED IN GRANTING IT

### 1. Standard for Summary Judgments

As set forth by this Court in *Tippens v. Celotex Corporation,* 805 F.2d 949,

952-3 (11th Cir. 1986), a summary judgment is only proper where

> "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c). The District Court shall consider all evidence in the record when reviewing the motion for summary judgment – pleadings, depositions, interrogatories, affidavits, etc. – and can only grant summary judgment "if *everything* in the record. . . demonstrates that no genuine issue of material fact exists."
>
> . . .
>
> If one or more of the essential elements is in doubt, then summary judgment must not be granted. Summary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to insure only those cases devoid of any need for factual determinations are disposed of by summary judgment. Summary judgment should be granted only when the evidence produced by the non-moving party, when viewed in a light most favorable to that party, fails to establish a genuine issue.

(emphasis in the original). *Also see Lane v. Celtex Corp.,* 782 F.2d 1526 (11th Cir.

1986).

As further observed by this Court in *Reese v. Herbert,* 527 F.3d 1253, 1271

(11th Cir. 2008), "the evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor." *Also see Stewart v. Booker T. Washington*

*Ins.* 232 F.3d 844, 850 (11th Cir. 2000); *Hairston v. The Gainesville Sun Publishing*

*Co.*, 9 F.3d 913 (11th Cir. 1994). The limitations on the grant of summary judgments are "to be strictly construed so as to insure that factual issues will not be determined without the benefit of the truth-seeking procedures of a trial." *Jackson Tool & Die, Inc., v. Smith*, 339 F.2d 88, 91 (5th Cir. 1964).

### 2. Dr. Zollo's testimony clearly created a question of fact

As noted above, Dr. Zollo's central opinion in this case was that the coefficient of friction values in the area where the Plaintiff fell were "below [the] minimum standards values that have long been accepted as required in order to classify a walkway surface as slip resistance," thereby rendering it unreasonably dangerous. This opinion was based upon the actual inspection and testing of the deck where the Plaintiff fell under virtually identical conditions following a rain shower; a review and analysis of the security video showing that the Plaintiff's fall and the events leading up to it; the deposition testimony of the Plaintiff Teresita Sorrels, the Defendant's corporate representative Jane Kilgour and crew members Solange Winifred and Milan Rai and various relevant industry standards in addition to his own extensive education, background and training in Civil Engineering and architectural issues. Regardless of whether Dr. Zollo tested other areas where the Plaintiff did not fall, it is clear that he rendered an admissible opinion that where the Plaintiff fell was in fact unreasonably slippery and hazardous. Therefore, it was clearly error for the court to enter a summary judgment.

31

It is also significant to note that Dr. Zollo's specific findings regarding the lack of sufficient co-efficient of friction were confirmed by the testing of the Defendant's own expert, Mr. Wills. Therefore, Mr. Wills findings which were in the record also made the entry of a summary judgment erroneous.

### 3. There was in the record outside of Dr. Zollo's testimony which was sufficient to create a question of fact

As pointed out in the Fifth Circuit's pre-Bonner opinion in *Great American Ins. Co. v. Cutrer*, 298 F.2d 79, 81 (5th Cir. 1962)

> 'Where the case turns on controverted facts and credibility of witnesses the case is peculiarly one for the jury.'
>
> 'In reaching its conclusion, as to negligence and proximate cause, a jury is frequently called upon to consider many separate strands of evidence and from these to draw its ultimate conclusions.'

Where notice is an issue, it can be established by proving constructive as well as actual notice. Actual notice exists where a carrier recognizes the need to post warnings signs, but either fails to do so on the occasion in question or utilizes signs which are inadequate. *See e.g. Harnesk v. Carnival Cruise Lines, Inc.*, 1992 A.M.C. 1472 (S.D. Fla. 1991)(negligent placement of warning signs sufficient to establish actual notice of danger); *Mabrey v. Carnival Cruise Lines, Inc.*, 438 So.2d 937 (Fla. 3d DCA 1983)(Ferguson, J.).

Constructive notice can be proved in many different ways. One is through the existence of prior *similar* accidents. *See e.g. Beretta v. Home Lines, Inc.*, 1980 AMC 1857 (S.D. N.Y. 1990)(one accident sufficient to create a question of fact on notice).

In order to give rise to notice, such prior accidents only need to be "substantially similar" and not identical. *See e.g. Weeks v. Remington Arms Co.,* Inc., 733 F. 2d 1485 (11th Cir. 1984).

Therefore, accidents occurring at different locations on the Defendant's premises or involving similar products are admissible to establish notice, where they share one or more of the essential characteristics of the subject accident. *See e.g. Ramos v. Liberty Mut. Ins Co.,* 615 F.2d 334 (5th Cir. 1980)(error to exclude evidence of the failure of a specially made derrick for one customer in suit by a subsequent customer based upon a similar failure); *Borden, Inc. v. Florida East Coast Ry Co.,* 772 F.2d 750 (11th Cir. 1985)(evidence of incident at a different location); *Worsham v. A.H. Robbins. Co.,* 734 F.2d 676, 687 (11th Cir. 1984)(evidence of prior incidents were admissible in suit against medical device manufacture where they were sufficiently similar to show that they provided defendant with notice of the possible consequences of its failure to take action). *Also see McGary v. Holland American Line Westours, Inc.,* 2004 A.M.C. 721 (W.D. Wash 2003).

Constructive notice can also be shown through the failure of the vessel to meet either the company's own safety regulations or industry standards. *See e.g. Galentine v. Holland American Line-West Tours, Inc.,* 333 F.Supp. 2d 991 (W.D. Wash. 2004). *Also see Cook v. Royal Caribbean Cruises Ltd.,* 2012 WL 1792628 (S.D. Fla. May 15, 2012).

33

Constructive notice of a defective condition can also be established by showing that a dangerous condition existed for a sufficient length of time that it should have been discovered through the exercise of reasonable care by the carrier. *See e.g. Erikson v. Carnival Cruise Lines, Inc.*, 649 So.2d 942 (Fla. 3d DCA 1995)(large puddle); *Grayson v. Carnival Cruise Lines, Inc.*, 576 So.2d 417 (Fla. 3d DCA 1991)(same).

Although it is only necessary to show the existence of notice under any one principle, substantial evidence of notice exists in the record of this case under all of the principles above.

### a. NCL failed to comply with its own policies and procedures as well as industry standards

Solange Winifred, who was the first crew member to respond to the Plaintiff after she fell, testified that at various times there were "special signs that are posted on the outside decks," warning passengers that the decks can be slippery when wet[11]

---

[11] Throughout this case, the Defendant repeatedly attempted to explain away this testimony through the disingenuous argument that the Plaintiff did not need warning that the decks were wet, since she was aware that it had been raining. The relevant point, which the Defendant continuously seeks to evade, is that the Defendant failed to give the Plaintiff any warning that the decks could be slippery when wet, which is a far different proposition. See D.E. 66 at 2. As noted by the Defendant itself in its motion for summary judgment, "rain water on an outdoor deck is not a dangerous condition in and of itself." [D.E. 61 at 16].

Teresita Sorrels testified on her deposition that since ships sail in both sunny and rainy weather, she would have expected NCL to advise or warn passengers in some manner if the exterior decks were unsafe or unreasonably slippery when wet. In the absence of such a warning, she stated that she would walk "normally at a

when it is raining. She testified that these temporary signs would be posted on some occasions, but not others. [D.E. 66 at 2, 9, 16-17; 78-1 at 5-6]. Ms. Winifred's testimony was confirmed by Security Officer Milan Rai, who likewise testified that these temporary signs were posted on some occasions, but not others. [D.E. 66 at 2, 16-17]. There were no signs posted on the evening of the accident. [D.E. 66 at 2, 9, 16-17; 66-6 at 118-9].

Ms. Winifred, who had worked for three years as an assistant waiter for NCL aboard the Norwegian Sky, also testified that her job duties involved cleaning the floor of the Outdoor Café located at the aft portion of deck 11, which contains the same teak deck flooring as the area where the subject accident occurred. Winifred deposition [D.E. 66 at 9, 16-17; 66-6 at 103-4]. In fact, four of the prior slip and fall accidents (numbers 8, 12, 15, and 28) occurred in this area. [D.E. 66-3].

Ms. Winifred further testified that she was instructed as part of her job that whenever she saw "water or some other liquid on the floor of the Outdoor Café," that she should immediately put up a sign and clean it, because it was known to her supervisors that the teak "floor would get slippery when it was wet." [D.E. 66 at 9, 16-17; 66-6 at 105-7]. In fact, she testified that this was one of the topics covered in

---

"normal walking pace," watch[ing] where she was going. [D.E. 66 at 2, 66-6 at 98-101]. NCL crew member Solange Winifred, who was walking on the wet deck at the same time, also testified that she too was walking "normally and did not feel the need to take any additional precautions because it had been raining. [D.E. 66 at 2; D.E. 66-6 at 29-30].

her department's monthly safety meetings. [D.E. 66 at 9, 16-17; 66-6 at 105-7].

Accordingly, the testimony of NCL's own crew members clearly establishes that the Defendant recognized the dangers posed by its teak deck when wet as well as the need to warn passengers of this danger. The above-described testimony clearly establishes competent substantial evidence to establish the dangerous nature of the teak deck when wet and both the Defendant's notice of this condition and its corresponding need to warn its passengers.

Since it is undisputed in the record below that the Defendant did not utilize any signs to warn the Plaintiff or other passengers of the excessively slippery and dangerous nature of the teak deck when wet at the time of the subject incident, the above testimony also clearly raises at the very least a question of fact as to the Defendant's liability for breach of its own rules and policies, providing yet another grounds on which the defendant's motion for summary judgment should have been denied. [D.E. 66 at 2, 9, 16-17; 66-6 at 108-9; 111; 118-19; 145].

### b. The existence of numerous substantially similar accidents also created a question of fact

A question of fact precluding the entry of a summary judgment was also created by virtue of evidence in the record of 22 prior substantially similar accidents involving passengers on the teak deck of the Defendant's vessel.    The court's rejection of this evidence on the grounds that the incidents were not sufficiently similar is clearly erroneous in light of the existing law on this issue.

36

In its order, the lower court pointed to the following so-called distinguishing factors which it found to be controlling: (1) many of the incidents occurred at different locations on "Norwegian Sky's pool deck, including near the pool and the jacuzzi,"[12] and (2) that "[t]he liquids that the other passengers claimed to have slipped on likewise differed." See D.E. 93 at 16-17.

In response to the order of the Magistrate Judge compelling discovery [D.E. 33], the Defendant provided a list of 31 other fall type accidents which occurred on deck 11 of the Norwegian Sky. [D.E. 66- 3]. In reviewing these interrogatory answers, Dr. Zollo identified 22 of these accidents as being "substantially similar."[13]

---

[12] In stating that "none of them occurred where Sorrels fell," [D.E. 93 at 16] the lower court obviously ignored the fact that the Plaintiff's accident occurred directly adjacent to the pool as reflected by both the security video and photographs taken by both experts, which were part of the record. [D.E. 66-1; 68-5; 68-6].

[13] The substantially similar accidents identified by Dr. Zollo were numbers 1, 5, 8, 9, 11, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 27, 28, 29, 30 and 31. [D.E. 66 at 12-16; 66-3; 66-6 at 17 and 18].

Although the Plaintiff had set the deposition of the Defendants's corporate representative for the purposes of determining the full circumstances surrounding each of these accidents (see *Taylor v. Carnival Corp.*, 2013 WL 4157520 (S.D. Fla. Aug. 14, 2013), when the witness appeared she was unprepared to respond to the questions. In this regard, the witness had only viewed the witness statements made by each of the involved individuals, without the other information in the possession of the Defendant, which had been requested. In order to resolve the issue without involving the court, the parties agreed that the Defendant would provide the information that it had available in response to the Plaintiff's pending interrogatory. [D.E. 66 at 12-13; 66-6 at 128-130]. Obviously, the Plaintiff has been required to rely upon the Defendant to provide this information, and accordingly, any deficiencies in

37

Zollo deposition [D.E. 66-6 at 17-18].

While at least two of the 31 identified accidents (no. 29 and 30) also involved slip and falls due to a wet deck caused by rain water [D.E. 66-3 at 18-19; 66-6 at 45-55], Dr. Zollo testified that 20 additional slip and fall accidents were "substantially similar" when comparing their *essential characteristics* to the essential characteristics of this accident, which involved a teak deck that was unreasonably slippery when wet due to contamination by a liquid [D.E. 66 at 12-16; 66-6 at 95-9].

In defining what constitutes "substantially similar" from an engineering standpoint, Dr. Zollo testified

> When I say "substantially similar," we are talking about a teak deck that is wetted by contamination of liquid form. That is what I'm saying is substantially similar, because performance under the standardized test reflects the nature of those conditions.

[D.E. 66 at 13; D.E. 66-6 at 95].

Dr. Zollo went on to further note that in determining whether another accident is substantially similar one looks to see whether its essential characteristics are such as to reasonably place the premises owner on notice that it should take steps to determine whether there is a need for corrective action to make the area safe. [D.E. 66 at 13]. "[I]f you have reports of adverse effects or adverse performance of a deck or a floor surface, then you are obligated to investigate that, and determine whether it is some sort of coincidence or if there is some defective condition." [D.E. 66 at 13;

the information is not the fault of the Plaintiff.

D.E. 66-6 at 95].

The standard for admissibility is 'substantial similarity' and not 'identical.' *See Ramos v. Liberty Mutual Ins. Co.*, 615 F.2d 334, 334-40 (5th Cir. 1980).   Dr. Zollo also indicated that the exact type of the liquid contaminant is irrelevant, since it will have the same degrading effect on teak. [D.E. 66-6 at 19-20].  Both Dr. Zollo and Mr. Wills as well as the Defendant's own corporate representative Jane Kilgour, all testified that the entire teak deck was made out of the same identical material and maintained in the same manner.   [D.E 66 at 13-14; 66-6 at 24-5, 47, 96-7, 120-5]. Accordingly, the precise location on the teak deck is irrelevant, since it is all made of the same identical material and subject to the same identical conditions.

As reflected by the chart [D.E. 66-4[14]], schematic [66-5 at 9-11] and photographs of deck 11 [D.E. 66-5], there are three separate areas of teak decking. The largest is the mid-ships area surrounding the pool, where the subject accident occurred.  The other two areas of teak decking are located in both the bow and stern portions of deck 11.  [D.E. 66-5 at 9-11].  All three of the areas are made of the same

---

[14] As reflected in footnote 7 to the Plaintiff's Response to the Defendant's Motion for Summary Judgment [D.E. 66 at n.7), this particular chart was prepared by Plaintiff's counsel to show the approximate location of each accident based upon the information provided by the Defendant." As further indicated in the Response "It is not suggested that this chart constitutes evidence, but [was] attached only to provide some context as to the general location of each of the numbered accidents based upon the information provided by NCL." *Id.*

The schematic, however, is a photograph of the ship's floor plan taken by the Defendant's expert, which was posted on the ship [65-5 at 9-11].

teak material, which has not charged in any fashion since at least 2009, when the first

of the 22 other substantially similar accidents was reported to have occurred. [D.E.

66 at 13; D.E. 66-6 at 120-5 and 127].

In discussing the substantially similarity of other slip and fall accidents

occurring on different locations on deck while wet, Dr. Zollo testified that one would

look

> at the entire teak deck because it is all exposed . . . And as a matter of
> fact, even the areas under cover are very substantially exposed to
> wetting because that's where the water is going to naturally drain. . . It's
> the same teak deck and the same wet condition . . . It would not matter
> to me whether it was starboard or port side, it is the same deck and the
> same conditions.

[D.E. 66 at 13; D.E. 66-6 at 97].

Although the lower court did not specify any other discrepancies in its order,

the Defendant had suggested that it is necessary to look to the source of the liquid,

the time of year, the time of day, weather conditions and date of occurrence. [D.E. 90

at 11-12]. The lack of relevancy of these factors was demonstrated, however, by the

testing of the Defendant's own expert David Wills.

Mr. Wills testified that when he first tested the subject deck on June 14, 2013

"it was a beautiful day . . .[a] typical day in paradise," differing significantly from the

conditions that existed at the time of the subject incident, which occurred just after

midnight when it was rainy and wet. Nevertheless, Mr. Wills testified that by placing

"less than a cup" of water on the deck, he was able to create a situation which he

40

considered to be substantially similar to the subject accident, so as to validate his coefficient of friction (slip resistance) testing. [D.E. 66 at 14; 66-6 at 135-142]. Accordingly, even the Defendant's own expert has indicated that placing a small amount of water, amounting to less than a cup, on the teak deck during a bright and sunny day would create a sufficiently similar condition in order to validate his testing.

Neither is the type of footwear determinative. There are no prohibitions or restrictions on the type of footwear which can be worn by passengers in this area, which is used by the ship for multiple activities, ranging from a pool during the day to a walkway in the evening when the pool is closed. As previously noted, the subject accident occurred shortly after midnight at a time when the pool was closed and the area was being used solely as a walkway by both passengers and crew.

The testimony of both experts regarding what is considered to be substantially similar from an engineering standpoint, is similar to the legal definition utilized by this Court. Since the standard for admissibility only requires that the other accidents be substantially similar, not be identical, accidents occurring at different locations on a defendant's premises or involving different products have all been found admissible to establish notice, so long as they share one or more of the essential characteristics of the subject accident. *See e.g. Weeks v. Remington Arms Co.,* 733 F.2d 1485 (11th Cir. 1984)(evidence of similar malfunctions in different models of the defendant's guns)*; Ramos v. Liberty Mutual Ins. Co.*, 615 F.2d 334 (5th Cir. 1980)(court erred by excluding evidence of the failure of a telescoping oil derrick manufactured for one

customer in a subsequent lawsuit brought by another customer for the collapse of an oil derrick manufactured for it, where there were similarities in design); *Borden, Inc. v. Florida East Coast Ry. Co.*, 772 F.2d 750 (11th Cir. 1985)(court erred in excluding evidence of similar act of vandalism occurring at one of the defendant's railroad other locations).

As observed by this Court in *Weeks*, 733 F. 2d at 1491:

> The relevancy of similar accident evidence has been firmly established in this circuit:
>
>> Evidence of similar accidents might be relevant to the Defendant's notice, magnitude of the danger involved, the Defendant's ability to correct a known defect, the lack of safety for intended uses, strength of the product, the standard of care, and causation.

Since the relevancy of evidence is dependent upon the purpose for which it is sought to be admitted, the courts have applied different standards as to the degree of substantial similarity necessary for prior accidents to be admissible depending upon its purpose. Where the purpose of the evidence is to establish notice, "the rule requiring substantial similarity of those accidents to the accident at issue should be relaxed." *Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070 (5th Cir. 1986); *Schmelzer v. Hilton Hotels Corp.*, 2007 WL 2826628 (S.D. N.Y. Sept. 24, 2007).

Accordingly, in *Jackson*, the Fifth Circuit allowed evidence of accidents involving other models of Firestone tires which shared the same characteristic defect. In reversing the trial court's exclusion of such evidence, the court rejected the

argument that the plaintiff's accident was "unique," stating "we decline to take such a narrow and unrealistic view of the matter." 788 F.2d at 1082-3. The court went on to hold "any differences in the circumstances surrounding these occurrences go merely to the weight to be given to the evidence." 788 F.2d at 1083.

In reaching this conclusion, the court relied upon the pre *Bonner* opinion of the Fifth Circuit in *Bailey v. Southern Pacific Transportation Co.*, 613 F.2d 1385 (5th Cir. 1980), which is therefore binding precedent in this circuit. In *Bailey*, the court held that evidence of "other happenings" consisting of mechanical difficulties with a crossing signal were admissible to establish the railroad's notice despite the fact that the malfunctions occurred at different times of the day or that the witnesses were traveling in different directions. The court went on to hold that any such differences went "strictly to the weight to be given to the evidence." 613 F.2d at 1389.

The same relaxed standard of admissibility has also been exhibited by this Court's cases on the issue of notice. For example, in *Jones v. Otis Elevator Co.*, 861 F.2d 655 (11th Cir. 1988), this Court held that evidence of prior incidents in which an elevator had been found shut down without an actual rider or accident were nevertheless admissible to establish the company's notice of potential problems in a subsequent lawsuit by a passenger, who was injured when the elevator did not stop at the ground level, but instead hit the bottom of the elevator shaft several times causing injuries. This Court rejected the elevator company's argument that the incidents were too dissimilar because the elevator did not disengage when the normal

43

stopping device malfunctioned in the litigated accident. This Court responded by stating, "we find no merit in this argument. A malfunction in the normal stopping device was common to each incident." *Also see Worsham*, 734 F.2d 676, 688-9 (evidence of prior incidents in suit against medical device manufacturer were admissible where they were sufficient to put the defendant on notice of the "harmful tendency or capacity of [the] product").

As pointed out in *Schmelzer v. Hilton Hotels Corp.*, 2007 WL 2826628, '2 (S.D. N.Y. 2007);

> The degree of similarity required depends upon the purpose for which prior accidents are offered. Court have applied a relaxed standard where the prior accidents are offered only to show that the defendant had notice. *See e.g. Jackson v. Firestone Tire & Ruber Co.*, 788 F.2d 1070, 1083 (5th Cir. 1986). Since all that is required is that the previous injury or injuries be such as to call the defendant's attention to the dangerous situation that resulted in the litigated accident, the similarity and circumstances of the accidents can be considerably less than that which is demanded when the same evidence is used for one of the other valid purposes. [citation omitted].

Although the lower court's order briefly refers to Federal Rule of Evidence 403, it does not indicate that this evidence would result in "unfair prejudice" as defined by Rule 403. As pointed out by the court in the binding *Ramos* decision in rejecting a similar argument involving the admissibility of evidence of a substantially similar, but not identical prior incident,

> This was not an occasion, however, for the application of Rule 403.

44

> Of course, "unfair prejudice" as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudice material. The prejudice must be "unfair."

615 F.2d at 340 quoting from *Dollar v. Long Mfg. N.C., Inc.*, 561 F.2d at 618.  The Fifth Circuit went on to hold that while the trial court has discretion in the admissibility of such evidence, "that discretion does not sanction exclusion of competent evidence without a sound, practical reason."  615 F.2d at 340.

Therefore, it is abundantly clear the trial court erred in granting the Defendant's Motion for Summary Judgment.

## CONCLUSION

It is clear that the lower court misapplied the *Daubert* test as well as this Court's controlling opinion in *Rosenfeld* in excluding Dr. Zollo's testimony. It is further apparent that the lower court also erred by granting the Defendant's Motion for Summary Judgment.  It is undisputable that Dr. Zollo's testimony creates a question of fact on the issue of the Defendant's negligence, nevertheless, it is further clear that there was sufficient additional evidence in the record to create a question of fact even without consideration of Dr. Zollo's testimony.

Accordingly, the lower court orders striking Dr. Zollo's testimony and granting summary judgment should be reversed, the final judgment entered thereon vacated and this cause remanded for further proceedings, including trial on the merits.

45

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 12,581 words.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on **January 31, 2014**, I electronically filed the Initial Brief with the clerk of Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: _____

ROBERT D. PELTZ (FL.BARNO.: 220418)
E-mail: Peltz@leesfield.com

## SERVICE LIST

| | |
|---|---|
| **ROBERT D. PELTZ** | **JERRY D. HAMILTON, ESQ.** |
| F.B.N. 220418 | F.B.N. 970700 |
| E-mail: Peltz@leesfield.com | Email: jhamilton@hamiltonmillerlaw.com |
| **CAROL L. FINKLEHOFFE** | **HECTOR RAMIREZ, ESQ.** |
| F.B.N. 0015903 | F.B.N. 484857 |
| E-mail: Finklehoffe@leesfield.com | Email: Hramirez@hamiltonmiller.com |
| LEESFIELD & PARTNERS, P.A. | **JESSICA CALVO, ESQUIRE** |
| 2350 South Dixie Highway | F.B.N. 484857 |
| Miami, Florida 33133 | HAMILTON, MILLER & BIRTHISEL, LLP |
| Telephone:  305-854-4900 | 150 S.E. Second Avenue, Suite 1200 |
| Facsimile:   305-854-8266 | Miami, FL 33131 |
| | Telephone: 305-379-3686 |
| | Facsimile: 305-379-3690 |
| | *Attorneys for Defendants* |